**Howard Edwin RHEA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 6–84–112–CR.**

Court of Appeals of Texas,
Texarkana.

Nov. 19, 1985.

**166**

Damon Young, Young, Patton & Folsom, Texarkana, Ark., Jack Herrington, Clarksville, for appellant.

Thomas H. Fowler, Co. Atty. of Red River County, Clarksville, for appellee.

BLEIL, Justice.

Howard Rhea appeals his conviction of the aggravated sexual assault of his two-year-old daughter. He complains that the child's videotaped statement should not have been admitted in evidence, raising the pivotal issue of whether the child was a competent witness. Because we conclude that the child was not a competent witness, admission of her videotaped statement violated Tex.Code Crim.Proc.Ann. art. 38.071 (Vernon Supp.1985). Therefore, we reverse the judgment.

In February 1984, Rhea and his wife separated and in March Shirley Rhea filed for divorce. On April 2, Shirley Rhea asked the Texas Department of Human Resources to investigate her husband for sexual abuse of their child which reportedly occurred March 11. As a part of an interview with the child and Shirley Rhea, Sann Cisco, a child protective specialist for the Department of Human Resources, caused to be prepared a videotaped interview of the child. Responding to specific questioning, usually with head nods, the child indicated that an incident of sexual abuse had occurred. When the child testified under oath at the trial, she said that she remembered nothing about the interview with Cisco and that Rhea did nothing which would be sexual abuse. The jury determined that on March 11, 1984, Howard Rhea committed aggravated sexual assault upon a child and assessed punishment at forty years confinement.

At trial, Sann Cisco testified to having prepared the videotaped interview. When the State offered the videotape into evidence as State's Exhibit 1, Rhea's attorney objected to its admission on the grounds that the child was an incompetent witness because she did not possess sufficient intellect to relate the transactions with respect to which she was interrogated and did not understand the obligation of the oath. Another ground for his objection was that the statements on the videotape resulted from questions calculated to lead to a particular statement. The court overruled the objection. After the court overruled Rhea's objection to the videotape's admissibility and ruled that the child was competent, Rhea's attorney called the child to testify in accordance with Tex.Code Crim.Proc.Ann. art. 38.071, § 2(a)(8) (Vernon Supp.1985). Essentially, the child indicated that she did not recall the videotaped interview. She recalled little other than having taken a bath with her daddy.

The statutory basis for admitting videotaped interviews is found in Tex.Code Crim.Proc.Ann. art. 38.071, § 2 (Vernon Supp. 1985). It provides that,

(a) The recording of an oral statement of the child made before the proceeding begins is admissible into evidence if:

(1) no attorney for either party was present when the statement was made;

(2) the recording is both visual and aural and is recorded on film or videotape or by other electronic means;

(3) the recording equipment was capable of making an accurate recording, the operator of the equipment was competent, and the recording is accurate and has not been altered;

(4) the statement was not made in response to questioning calculated to lead the child to make a particular statement;

(5) every voice on the recording is identified;

(6) the person conducting the interview of the child in the recording is present at the proceeding and available to testify or be cross-examined by either party;

(7) the defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and

(8) the child is available to testify.

(b) If the electronic recording of the oral statement of a child is admitted into evidence under this section, either party may call the child to testify, and the opposing party may cross-examine the child.[1]

■ Rhea maintains that because the child was not a competent witness, the requirement in Article 38.071, § 2(a)(8), that the child be available to testify, is not fulfilled. Ordinarily, whether a witness is competent rests within the sound discretion of the trial court. *Garcia v. State*, 573 S.W.2d 12 (Tex.Crim.App.1978); *Fields v. State*, 500 S.W.2d 500 (Tex.Crim.App.1973). The rule for determining the competency of a witness is found in Tex.Code Crim.Proc. Ann. art. 38.06 (Vernon 1979). It provides, in pertinent part, that all persons are competent to testify in criminal cases except:

Children or other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated, or who do not understand the obligation of the oath.

When Article 38.06 was first enacted in 1925, it merely codified existing case law. Child witnesses have long been required both, (1) to be able to give a clear recital of the events in question; and (2) to be aware that some sanction will attach to false swearing. *Nicholas v. State*, 99 Tex.Cr.R. 504, 270 S.W. 555 (1925); *Valdez v. State*, 71 Tex.Cr.R. 487, 160 S.W. 341 (1913); *see also* 1 R. Ray, *Texas Law of Evidence Civil and Criminal* § 294 (Texas Practice 3d ed. 1980). The trial court, without articulating any specific findings, apparently determined that the child possessed sufficient intellect and understood the obligation of an oath because the child was found to be a competent witness. The trial court based its determinations upon the child's responses to lengthy questioning by the court, which included the use of an E.T. doll and a teddy bear. The trial court

questioned her extensively concerning what was correct and what was not, her capacity to recognize what was true, and her ability to understand and accurately relate present occurrences in court concerning the E.T. doll and teddy bear. In no manner did the child indicate an ability to relate past events. Most of the child's responses were "uh-huh", "huh-uh" or head nods. She demonstrated an ability to accurately relate facts pertaining to the doll and teddy bear and refused to accept incorrect answers concerning the doll and teddy bear. Typical of the child's responses which led the court to determine her to be a competent witness, is the following (references to the child's name are deleted):

Q. [W]hat is this? Who is this? Does this have a name? You are shaking your head no. Can you say no? What is this? Is this a chipmunk or is it a bear? What is it?

A. I don't know what its name is.

Q. You haven't given it a name? Is it yours?

A. Uh-huh.

Q. You are shaking your head yes; is that right? And what name do you think you are going to give it? Is it a boy or girl?

A. It's a girl.

Q. What are you going to call it?

A. Huh?

    . . . .

Q. How old are you? Three? Is that right? Good. Did you have a birthday party?

A. Huh-uh.

Q. No birthday party?

A. Huh-uh.

Q. Have you ever had a birthday party where you had a cake with candles on it?

A. Huh-uh.

Q. You haven't? What is this?

A. E.T.

---

**1.** Because Rhea does not directly challenge the constitutionality of Article 38.071, we do not consider that issue. However, courts of appeals have differed on this question. *Compare Long v. State*, 694 S.W.2d 185 (Tex.App.—Dallas 1985, no pet.) and *Powell v. State*, 694 S.W.2d 416 (Tex.App.—Dallas 1985, no pet.), holding the statute unconstitutional; with *Jolly v. State*, 681 S.W.2d 689 (Tex.App.—Houston [14th Dist.] 1984, pet. granted), holding otherwise.

Q. E.T.? I don't keep up with all of the movies. Now I know what you are talking about. That's E.T. Have you seen E.T. in the movies?

A. Huh-uh.

Q. Have you seen E.T. on the television?

A. Huh-uh.

Q. I wonder what we call this? It needs a name, doesn't it?

A. Uh-huh.

Q. Everything needs a name. Can you think of a name we might call it?

A. Huh-uh.

Q. I want you to try to think of one and then tell me sometime what you have named it. Would you do that?

A. Uh-huh.

. . . .

Q. And you are three years old?

A. Uh-huh.

Q. You are holding up three fingers. Can you say three?

A. Uh-huh.

Q. Say three for me.

A. I know about three.

Q. You know about three? I'll bet you do. And what were you before you were three? How many fingers were you? You are holding up three again? Weren't you two, two fingers?

A. I was this many.

Q. Now you are holding up two and now you are three; is that right?

A. Uh-huh.

Q. [D]o you always tell the truth?

A. Huh-uh.

Q. No? What does that mean? You don't know When (sic) you hold your hands out like that? Do you know what the truth is?

A. Huh-uh.

Q. You don't know? Do you know what a fib is?

A. No.

Q. Do you know what a lie is?

A. Huh-uh.

Q. Do you always tell your momma things that happen?

A. Huh-uh.

Q. If she asks you?

A. Huh-uh.

Q. You don't or you do?

A. Huh-uh.

Q. Does that mean that you always tell her or that you don't always tell her?

A. (Witness shrugs.)

Q. Do you ever make up stories?

A. Huh-uh.

Q. You don't?

A. Huh-uh.

Q. You are shaking your head no?

A. Huh-uh.

Q. You don't just make up something that didn't happen?

A. Huh-uh.

Q. No? You're shaking your head no. Do you mean no by that?

A. Uh-huh.

Q. You're shaking your head yes now. Would you tell something that had not happened? You're shaking your head no; is that right?

A. Uh-huh.

Q. Good. Talk to me. Can you think of anything to tell me?

A. Huh-uh.

Q. Okay. Tell me this; who did you spend last night with?

A. Big momma.

Q. And do you spend many nights with big momma?

A. Uh-huh.

Q. And what about your mother, do you stay with your mother?

A. Uh-huh.

Q. Who else lives there?

A. My Angie.

Q. Who is Angie?

A. My sister.

Q. Is she older than you are or younger? You are shaking your head no. How old is she? Do you know?

A. Huh-uh.

Q. Well, is she bigger than you or is she smaller?

A. Huh-uh.

Q. You're shaking your head no. Is she a baby?

A. Huh-uh.

Q. She's not a baby? Is she—does she go to school?

A. Uh-huh.

Q. You're shaking your head yes; is that right? Does she go to school? How old is she?

A. (Witness shrugs.)

Q. Sho (sic) is holding you?

A. Mommie.

Q. And, mommie, can you tell me about her sister, Angie? How old is she?

MRS. RHEA: She's eleven.

BY THE COURT:

Q. Is Angie good to you?

A. Uh-huh.

Q. She is a good sister?

A. Uh-huh.

Q. You're shaking your head yes, she is a good big sister. Do you all ever play together?

A. Uh-huh.

Q. What do you play?

A. Toys.

Q. What kind of toys? You're holding up this little bear. Do you think that's a bear?

A. Uh-huh.

Q. It's not a kitty cat?

A. Huh-uh.

Q. It's not a puppy dog?

A. Huh-uh.

Q. It's not a lion?

A. Huh-uh.

Q. It's not a tiger?

A. Huh-uh.

Q. What is it?

A. A teddy bear.

At this competency hearing, the defense attorney asked her about the truth.

Q. When you talk to your mommy do you always tell her the truth?

A. Uh-huh.

Q. You never tell her a story?

A. Huh-uh.

Q. Do you sometimes tell stories?

A. Huh-uh.

Q. Do you know what the truth is?

A. Huh-uh.

Q. Do you know what it means to tell a story?

A. Huh-uh.

Q. Do you know the difference between telling the truth and telling a story?

THE COURT: She is shaking her head "no."

. . . .

Q. If you are playing and you break something at your house, a dish or something, do you tell your mommie that you did it?

A. Huh-uh.

Q. Do you tell her you didn't do it?

A. (No response.)

Q. Do you get in trouble if you ever tell a story?

A. Huh-uh.

Q. You don't get in trouble? Do you ever get a spanking if you tell a story?

A. Huh-uh.

Q. My little girl does sometimes.

THE COURT: [D]id you ever get a spanking?

[THE WITNESS]: Huh-uh.

When ultimately called and sworn as a witness the court questioned her further about telling the truth.

THE COURT: We will play some more games if you will tell us the truth. Do you remember how you told me the truth a little bit ago when we were playing our game?

THE WITNESS: That's a pumpkin.

THE COURT: A what?

THE WITNESS: A pumpkin.

THE COURT: Well, great. That's a good pumpkin.

THE WITNESS: I wrote it for you.

THE COURT: Thank you. You can really draw good. That's good.

THE WITNESS: It's only a pumpkin.

THE COURT: Are you going to answer our questions for us?

THE WITNESS: What questions?

THE COURT: We are going to play a game and we are going to let you answer some questions. Can you do that for us?

THE WITNESS: I guess so.

We conclude that the court erred in determining that the witness was competent because the child's testimony indicates that she did not possess sufficient intellect to relate transactions about which she was questioned when placed under oath as a witness.

■ Now we consider whether the child was able to understand the obligation of the oath. We do not require that a child know the meaning of "obligation" or "oath". The obligation to tell the truth may take many forms, but the child must recognize a requirement to tell the truth and know that some penalty attaches when the truth is not told. This obligation may be that if a witness lies, the bad man or devil will get him, *Mason v. State*, 2 Tex. App. 192 (1877); he can be sent to prison, *Smith v. State*, 73 Tex.Cr.R. 273, 164 S.W. 838 (1913); or, it is wrong (to lie), *Powell v. State*, 100 Tex.Cr.R. 541, 271 S.W. 915 (1925). Conversely, when a child has utterly not understood the obligation of the oath, he has been held not to be a competent witness. *Jimenez v. State*, 103 Tex. Cr.R. 163, 280 S.W. 829 (1925); *Mays v. State*, 58 Tex.Cr.R. 651, 127 S.W. 546 (1910); *Williams v. State*, 12 Tex.App. 127 (1882). Our courts have continued to require this understanding of the obligation of the oath. *Provost v. State*, 514 S.W.2d 269 (Tex.Crim.App.1974); *Fields v. State*, *supra.*

This child said that she did not know the meaning of the truth, a fib, a lie, or what it means to tell a story. During the trial court's questioning, the child's inconsistent answers indicated that she had absolutely no understanding of the concept of truth. Not only did the child not understand the difference between the truth and a lie, she did not know that she had an obligation to tell the truth. She was asked only two questions concerning whether she knew she would be punished if she testified false-

ly. She responded no to each question. Her testimony indicates that she is simply too immature to understand what it is to tell the truth or that there is such a thing as an obligation to do so.

■ Historically, children under the age of four have been viewed as being too young to be competent witnesses. In a case in which the testimony of a four-year-old child who did not understand the obligation of an oath was held inadmissible, the Court of Criminal Appeals, quoting from Wharton's Criminal Evidence, stated that

> To permit a child under four years of age to be sworn and examined as a witness would be to trifle with public justice.... Four years has been assigned as the minimum age, but after this age the question of admissibility is to be decided by the court.

*Jimenez v. State, supra.* Today, however, courts generally agree that there is no precise age limit which determines the competency of a child witness. In so holding, the Supreme Court in *Wheeler v. United States*, 159 U.S. 523, 16 S.Ct. 93, 40 L.Ed. 244 (1895), concluded, "While no one would think of calling as a witness an infant only two or three years old, there is no precise age which determines the question of competency."

■ Under the present circumstances, we further conclude that the trial court erred in determining that the child was a competent witness because of her inability to understand the obligation of an oath. When, as here, a determination that the witness is competent is made with little, if any, evidence of the required sufficient intellect and no evidence of an understanding of the oath, the limits of the trial court's discretion are exceeded.

■ Since the child is not available to testify, due to her incompetence, the requirements of Article 38.071 concerning the admissibility of the videotaped statement

were not fulfilled. The court erred in overruling the objection to the exhibit.[2]

The child's answers on the videotape were arguably given in response to questions calculated to lead the child to make a particular statement. However, because we have concluded that the child was not a competent witness and thus, that the use of the videotape was error, we find it unnecessary to determine whether the videotaped statement was in response to questioning calculated to lead the child to a particular statement.

■ Rhea additionally challenges the sufficiency of the evidence supporting his conviction. We review all the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Carlsen v. State,* 654 S.W.2d 444 (Tex.Crim.App.1983); *Griffin v. State,* 614 S.W.2d 155 (Tex.Crim.App.1981). Excluding the videotape, scarcely any evidence remains to support the verdict. Without that evidence, we conclude that a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.

We reverse the trial court's judgment and remand the cause to that court.

CORNELIUS, Chief Justice, dissenting.

I respectfully dissent.

The State produced evidence that on March 11, 1984, shortly before his daughter K____'s third birthday Rhea caused the child to have oral sexual relations with him. The child related the act to her grandmother and others on March 30, 1984. On April 2, an interview with the child was taped by Sann Cisco of the Texas Department of Human Resources. On the videotape, K____ confirms that her father had placed his sexual organ in her mouth, but denies that he had touched her sexual organ, had placed her hand on his sexual organ, or that any other sex acts had occurred.[1]

**2.** We do not address the question of a defendant's fundamental right to be confronted with witnesses against him as guaranteed in the Sixth Amendment to the United States Constitution. Were this child a competent witness but lacking any memory of the event, we would squarely face that issue. *See generally, California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

**1.** The transcription of the videotaped interview follows.
Q. What's your name?
A. K____.
Q. How old are you?
A. Three.
Q. Three? Did you just have a birthday?
A. Uh-huh.
Q. Where do you live, K____?
A. In Big Mama's house.
Q. In Big Mama's house. Oh ... K____, look at these ... do you see some dolls here?
A. (Nods her head yes)
Q. Gosh ... do you sometimes get to spend the night with your daddy?
A. (Nods her head yes)
Q. Do you get to stay with him?
A. (Nods her head yes)
Q. Do ya'll (sic) do some fun things together?
A. (Nods yes) Play together....
Q. Play together? Look at one of these dolls ... could one of these dolls be your daddy?
A. Uh-huh. (points to the girl doll)
Q. Which one? This one?
A. This one. (points to the doll in the dress)

Q. This one has a little dress on ... could that be you?
A. Uh-huh.
Q. Let's pretend that doll is you, okay? Look at this doll ... let me show you something special about this doll, okay? Can I show you? I'm going to take the shirt off, now, look real closely. Look what she has right there ... what are those called K____? (pointing to the breasts)
A. (Makes grunting sound) Huh-uh.
Q. What's the word for that? What are those called? *What's that called?*
A. *A mouth.*
Q. *Good K.. What's that called?*
A. *Eyes*
Q. *Good .. What's that called?*
A. A titty.
Q. Good! Let's see what else this doll has, what is that? *(Takes hold of penis)*
A. A tee-tee.
Q. Does your daddy have one of those?
A. Uh-huh.
Q. Have you ever seen it?
A. Uh-huh.
Q. When did you see it?
A. Today.
Q. Today? Have you seen it some other times than today?
A. (Nods yes)
Q. Look at this doll ... It's special, too. This is going to be K____. K____, you ... K____ doesn't have blonde hair, does she? We're going to pretend like this is you, anyway,

**172**

I would hold that the videotape did not violate Tex.Code Crim.Proc.Ann. art. 38.-071, § 2(a)(4) (Vernon Supp.1985). That section provides that a statement, to be

Q. okay? Look what K____ has. What's that called, K____?
A. Uh .. a tee-tee.
Q. Alright. Do you have a tee-tee? Right there? Okay. Have you and your dad ever taken a bath together?
A. (Nods yes)
Q. Were ya'll (sic) sitting in the same bathtub together?
A. (Nods yes)
Q. Well, let's pretend like that happened, okay? Let's you and me pretend. K____, take off your clothes, it's bath time. Do you want me to help you take off your clothes?
A. (Nods yes)
Q. Did daddy get in the bathtub with you? Or were you in there by yourself?
A. (Nods yes)
Q. Together or by yourself?
A. Me and daddy were in there though.
Q. Okay. K____, this is the bathtub. Okay, K____'s in the bathtub. What did daddy do? Did daddy get in the bathtub with you?
A. (Nods yes) Around here.
Q. Okay, there's daddy in the bathtub. Did Daddy touch K____'s tee-tee?
A. (Nods no)
Q. Did daddy put his hand ... did he touch K____'s tee-tee?
A. (Nods no)
Q. Did he put .. did he make you put your hand on his tee-tee?
A. (Nods no)
Q. No? Did daddy make you put his tee-tee in your mouth?
A. (Nods yes)
Q. Okay, can you tell me about that? What happened?
A. He laid down ...
Q. Okay, then what happened? In the bathtub, was he laying down? What did he tell you to do?
A. I was laying down there and I was sucking it.
Q. You were sucking it?
A. Yeah.
Q. Did he ask you to do that? What exactly did he tell you to do?
A. I don't know.
Q. Okay. Take the doll and show me what happened when you sucked it? Show me what happened ... (K____ puts girl doll's face on boy doll's lap) Oh, did this part of your daddy go in your mouth? Did it go inside your mouth?
A. Uh-huh.
Q. Okay, did he do anything else with you? Did he put his fingers in your ... what is that called K____?
A. (Nods no)
Q. What is that called?
A. A sweaten ... (nods head yes).

Q. A sweaten ... did he put his tee-tee in your sweaten?
A. (Nods no)
Q. Did he put his fingers inside your sweaten?
A. (Nods no)
Q. But he made you put your mouth on his tee-tee and he laid down in the bathtub, is that right?
A. (Nods yes)
Q. Okay, how many times did that happen?
Q. *Three times?*
A. (Motions with hand four times)
Q. Okay, what bathroom were you in? At his house?
A. At the old one.
Q. At the old house ... do you know where that is ... what town that's in?
A. Down here ... you know where at the crossroads?
Q. Yeah, okay, when did that happen? When was the last time that it happened?
A. He was choking mama.
Q. Mama? Who was choking her?
A. She went in here.... there she is..
Q. Was your mama there when your daddy put his tee-tee in your mouth?
A. (*Nods no*)
Q. Who was in the house besides ya'll (sic)?
A. We was there and then we got out of the tub ... and then he let the water out. And that was all of it.
Q. Did he put his tee-tee in your tee-tee?
A. (Nods no)
Q. When was it ... was it the last time that you went to see your daddy that he made you put his tee-tee in your mouth?
A. Then he got up and then he ... I sucked his tee-tee.
Q. *You sucked his tee-tee?*
A. *Uh-huh.*
Q. Okay, what is that? Do you know what that is?
A. A belt.
Q. Okay. How many times did he make you suck his tee-tee?
A. He was laying down here ...
Q. Did your daddy tell you not to tell anybody?
A. (Nods no)
Q. What did he say? Did he tell you not to tell anybody it happened?
A. (Nods no)
Q. He didn't say anything? Did he say, "K____, don't tell anybody that this happened?"
A. (Nods no)
Q. Did he say that?
A. Huh-uh.
Q. Has he ever done this with any other little girls? Just you?
A. (Nods no)
Q. Thank you, K____. Thank you for helping me, okay?

admissible, must not have been made "in response to questioning calculated to lead the child to make a particular statement...."

We have interpreted this provision to prohibit use of the tape only if the statement, taken as a whole, was the product of leading questions. Here, the child steadfastly refused to agree to several suggestions of improper conduct made to her by her interviewer, e.g.:

Q. ... Did Daddy touch K____'s tee-tee?

A. (Nods no)

Q. [D]id he touch K____'s tee-tee?

A. (Nods no)

Q. [D]id he make you put your hand on his tee-tee?

A. (Nods no)

Q. No? Did daddy make you put his tee-tee in your mouth?

A. (Nods yes)

Further, several of the child's responses were not merely by yes or no answers, but were positive narrative statements by the child in response to nonleading questions. For example:

Q. Okay, then what happened? In the bathtub, was he laying down? What did he tell you to do?

A. I was laying down there and I was sucking it.

The statement, taken as a whole, rebuts the argument that it was so influenced by suggestive questioning as to make it objectionable under Section 2(a)(4).

Neither do I agree that the child, who was three years old when the videotape was made, was incompetent as a witness. The determination of whether a witness is competent is within the sound discretion of the trial court, and will not be disturbed on appeal unless an abuse of discretion is shown. *Fields v. State*, 500 S.W.2d 500 (Tex.Crim.App.1973). Inconsistencies or contradictions in a child's testimony do not in themselves render the testimony incompetent. *Fields v. State*, supra; *Smith v. State*, 410 S.W.2d 642 (Tex.Crim.App.1966). The test for competency is whether or not the child possesses sufficient intellect to relate transactions about which she is interrogated, and understands the obligation of an oath to tell the truth. Tex.Code Crim. Proc.Ann. art. 38.06(2) (Vernon 1979). To understand the obligation of an oath simply means the witness understands that she has an obligation to tell the truth.

The careful trial judge questioned K____ extensively concerning what was correct and what was not, her capacity to recognize what was true, and her ability to understand and accurately relate occurrences and circumstances. While she apparently did not understand the nature of an oath *as such*, she clearly demonstrated an ability and a willingness to accurately relate facts, and she refused to accept incorrect answers to questions even when they were suggested. A careful review of the child's testimony supports the trial court's conclusion that the child was a competent witness. *See Provost v. State*, 514 S.W.2d 269 (Tex.Crim.App.1974); *Fields v. State*, supra; *Smith v. State*, supra; *Clark v. State*, 659 S.W.2d 53 (Tex.App.—Houston [14th Dist.] 1983, no pet.); *Beavers v. State*, 634 S.W.2d 893 (Tex.App.—Houston [1st Dist.] 1982, pet. ref'd); *D.L.N. v. State*, 590 S.W.2d 820 (Tex.Civ.App.—Dallas 1979, no pet.). I am not willing to hold that to be competent a witness must necessarily understand the meaning of the word "oath" or agree that he will be punished if he fails to tell the truth. There are undoubtedly many persons who, by reason of age, mental impairment, religious conviction, philosophical bent or whatever, do not understand or do not accept an oath or a system of rewards and punishments. The correct rule is that if a witness is able to relate events and facts accurately, and understands that he is under an obligation to do so, he is competent. *D.L.N. v. State*, supra. By that standard K____ was a competent witness. An indication of her understanding that she had an obligation to tell the truth is the following:

Q. Do you ever make up stories?

A. Huh-uh.

Q. You don't?

A. Huh-uh.

Q. You are shaking your head no?

A. Huh-uh.

Q. You don't just make up something that didn't happen?

A. Huh-uh.

Q. No? You're shaking your head no. Do you mean no by that?

A. Uh-huh.

Q. You're shaking your head yes now. Would you tell something that had not happened? You're shaking your head no; is that right?

A. Uh-huh.

If we require a witness to recite the magic words relating to oath and punishment, some witnesses who are able and willing to tell the truth will be prevented from doing so simply because they are disadvantaged or have aberrant personalities or attitudes.

Moreover, greater latitude should be allowed in accepting testimony from young or handicapped witnesses where, as it does here, their testimony relates to assaults against their own persons rather than to events they may have merely observed. Their ability to accurately relate the facts in the former cases is obviously better than those in the latter cases.

The majority cites an 1895 case in support of the proposition that a three year old is not competent as a witness. I would observe that there is a vast difference between the children of today and the children of 1895. The effects of radio, television, moving pictures, and the educational opportunities which daily confront even very small children, render today's children far more intelligent, observant, and mature than the children of only a few decades ago.

I also find sufficient evidence to support the verdict. Although Rhea denied the act, he admitted that he took a bath with K____, and he was inconsistent when he testified that he kept himself covered at all times during that incident. He also denied committing other offenses which were proven against him. The trial was some seven months after the offense, and

K____'s trial testimony was in open court with her father, lawyers and jury present. Considering all these facts, the jury could have believed that K____ was confused and intimidated in open court, and that the other direct and circumstantial evidence was more convincing. One purpose behind the passage of Article 38.071 was to prevent the possibility of a child victim being intimidated by her attacker during in-court testimony. When coupled with the videotape testimony in which she denied other sexual contact but specifically described the oral sex act, her in-court denial may well have resulted from the type of intimidation Article 38.071 was designed to prevent.

Reviewing all the evidence in the light most favorable to the prosecution, I conclude that a rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Carlsen v. State*, 654 S.W.2d 444 (Tex. Crim.App.1983).

I would affirm the judgment.